UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RAMONA HARRIS, et al.,

    Plaintiffs,

    v.

DISTRICT OF COLUMBIA,

    Defendant.

No. 24-cv-1929-CRC-ZMF

REPORT AND RECOMMENDATION

Plaintiffs Ramona Harris ("Ms. Harris") and her child, D.H., bring this action against Defendant the District of Columbia Public Schools ("DCPS") alleging violations of the Individuals with Disabilities Education Act ("IDEA"). *See* 20 U.S.C. §§ 1400–82. Plaintiffs have filed a motion for summary judgment. *See* Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 7. Defendant has filed a cross-motion for summary judgment. *See* Def.'s Opp'n to Pls.' Mot. for Summ. J. & Cross-mot. for Summ. J. ("Def.'s Cross-mot."), ECF No. 13. Having considered the parties' submissions and the Administrative Record,[1] and for the reasons set forth herein, the Court recommends that Plaintiffs' motion be DENIED, and the Defendant's motion be GRANTED.

I.    BACKGROUND

    A.    Statutory Framework

The IDEA aims to provide "every child [with] a meaningful opportunity to benefit from public education." *Boose v. District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015). Congress

---

[1] For ease of reference, citations to the Administrative Record will refer to the "AR" and cite to the consecutive page numbers provided at the bottom of each page.

1

enacted the IDEA "to ensure that all children with disabilities have available to them a free and appropriate public education [("FAPE")] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "While the District of Columbia is required to provide a FAPE to disabled students, it is not required to, and does not guarantee, any particular outcome or any particular level of academic success." *Holman v. District of Columbia*, 153 F. Supp. 3d 386, 389–90 (D.D.C. 2016) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192 (1982)).

To satisfy the FAPE requirement, "school districts must develop a comprehensive plan, known as an individualized education program [("IEP")], for meeting the special-educational needs of each student with a disability." *A.W. v. District of Columbia*, No. 12-cv-411, 2014 WL 12884524, at *3 (D.D.C. Sep. 19, 2014) (citing 20 U.S.C. § 1414(d)(2)(A)). "The IEP is a written statement that is reviewed annually and includes goals and instructional objectives for the student's education, services to be provided, projections regarding the dates on which such services are to be offered, and criteria for evaluating whether instructional objectives are met." *Holman*, 153 F. Supp. 3d at 389 (citing 20 U.S.C. §§ 1401(14), 1414(d)(1)(A)). The IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S. 386, 399 (2017).

A reevaluation of a child with a disability must occur at least once every three years and may not occur more than once a year, unless the parents and local education agency agree. *See* 20 U.S.C. § 1414(a)(2)(B)(ii). The public agency must "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including

2

information provided by the parent." *Id.* § 1414(b)(2)(A). In addition, the public agency must ensure that "the child is assessed in all areas of suspected disability." *Id.* § 1414(b)(3)(B).

"[A]ny party" may present a due process complaint ("DPC") "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child." *Id.* § 1415(b)(6)(A). "Whenever a complaint has been received under (b)(6) . . . the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency." *Id.* § 1415(f)(1)(A). Any party may appeal that decision in court. *See id.* § 1415(i)(2)(A).

### B. Factual Background

#### 1. *Early Years and Diagnosis*

D.H. started displaying disruptive behaviors in 2012, when he was three years old and attending preschool. *See* AR 324. On August 27, 2012, he received a psychological evaluation. *See* AR 325. D.H. had average cognitive functioning. *See* AR 325. However, he indicated many at-risk and clinically significant scores on social-emotional and behavioral status assessments. *See* AR 325. According to the August 30, 2012 IEP, DCPS concluded that D.H. qualified for special education and related services. *See* AR 325.

In 2015, while D.H. was in kindergarten at KIPP DC, a public charter school, Ms. Harris requested that the DCPS psychologist conduct an evaluation. *See* AR 9, 33. The evaluation revealed average cognitive functioning and academic skills. *See* AR 10. However, D.H. again scored within the at-risk and clinically significant range on several behavioral functioning and social-emotional status assessments. *See* AR 10–11. In a March 27, 2015 comprehensive psychological evaluation report, the DCPS psychologist found that D.H. "had a history of

3

behavioral concerns, including classroom disruption, fighting, impulsivity, off-task behaviors, difficulty following classroom/school rules and physical aggressive behaviors." AR 9. D.H. was "spending several hours of the school day outside the classroom due to [his] disruptive behaviors," which negatively impacted his education. AR 10. The DCPS psychologist concluded that D.H. was eligible for special education services as a student with multiple disabilities based on emotional disturbance and other health impairment. *See* AR 8.

After kindergarten, D.H. transferred to Accotink Academy, a private school. *See* AR 355. While there, he continued to present severe behavioral challenges. *See* AR 356. On October 23, 2017, he began receiving one-on-one instruction in a separate classroom due to his negative peer interactions and unsafe behaviors. *See* AR 357.

In June 2018, DCPS conducted a partial psychological reevaluation, including a records review and interviews with D.H.'s mother and teacher. *See* AR 11. The DCPS psychologist concluded that D.H. continued to meet the criteria for special education services. *See* AR 11. In January 2019, an updated functional behavior assessment ("FBA") and behavioral intervention plan ("BIP") were completed before D.H. transferred to Phillips Laurel School, a private special education day school. *See* AR 11.

   2.   *2021-2022 School Year*

In spring 2021, a DCPS school psychologist conducted a virtual triennial reevaluation. *See* AR 12–13. In September 2021, DCPS conducted an annual review of the IEP. *See* AR 14. The updated IEP provided for 26 hours per week of specialized instruction, 240 minutes per month of behavioral support services, 90 minutes per week of occupational therapy ("OT") services, and the support of a dedicated aide for 7 hours per day. *See* AR 14. On March 28, 2022, D.H.'s special education providers reported that he was progressing on all IEP goals. *See* AR 14.

4

    *3.*  *2022-2023 School Year*

On October 13, 2022, DCPS convened D.H.'s 2022 annual IEP review, which provided for the same services as the previous year. *See* AR 14–15. As of June 23, 2023, D.H. was progressing on several academic IEP goals but regressing on managing impulsive behaviors. *See* AR 15. On July 13, 2023, Ms. Harris's counsel requested by email that D.H. be reevaluated with a comprehensive psychological exam, an OT evaluation, a speech-language evaluation, and an FBA. *See* AR 16. Ms. Harris's counsel addressed the email to Phillips Laurel School and copied Nakeisha Mayo, the DCPS Progress Monitor. *See* AR 16, 1003–04. On August 25, 2023, Ms. Mayo responded with proposed dates for D.H.'s IEP review and data analysis meeting to agree on necessary evaluations. *See* AR 1003. Ms. Mayo requested a later date for the eligibility meeting, to be held after completion of new evaluations. *See* AR 1003. In response, Ms. Harris's counsel agreed that D.H.'s parent and team were available for an IEP meeting on October 5, 2023. *See* AR 1007.

    *4.*  *2023-2024 School Year*

In September 2023, D.H.'s DCPS IEP team met due to D.H.'s "ongoing behavior issues and safety concerns." *See* AR 1008, 1011. The team discussed moving D.H. to another school. *See* AR 1011. In the fall of 2023, D.H. did not receive any of his required OT services, as Phillips Laurel School did not have a provider available. *See* AR 17.

On December 4, 2023, the DCPS IEP team met to discuss D.H.'s transition and begin the triennial reevaluation process. *See* AR 17. On December 5, 2023, D.H. transferred to Foundation School. *See* AR 17. On January 29, 2024, the DCPS team finalized an updated FBA and BIP. *See* AR 17, 551. According to Ms. Harris, D.H. was doing well at Foundation School and his behavior was "on level." *See* AR 17.

C.   Procedural Background

On January 5, 2024, Ms. Harris submitted a DPC. *See* AR 4. Ms. Harris alleged that DCPS denied D.H. a FAPE from 2021 onwards by failing to (1) conduct appropriate reevaluations of D.H.'s disabilities, (2) create appropriate annual IEPs, and (3) comply with the terms of the IEPs. *See* AR 6–7. On March 25 and 27, 2024, Hearing Officer ("HO") Peter B. Vaden convened the administrative hearing. *See* AR 5.

Marla Crawford (Educational Advocate) and Jenice Terrell (Educational Advocate) testified on behalf of Ms. Harris and D.H. *See* AR 5, 33. Ms. Harris also testified. *See* AR 5. Camille Lesseig (Resolution Specialist) and Timothy Ryan (Nonpublic monitor) testified on behalf of DCPS. *See* AR 5, 33.

On April 5, 2024, HO Vaden issued a determination ("HOD"). *See* AR 1. HO Vaden ruled in favor of DCPS on the first two claims. *See* AR 22, 26. HO Vaden ruled partially in favor of the Plaintiffs on the third claim. *See* AR 26–29. Within that claim, Ms. Harris argued that DCPS failed to provide: (a) all required OT services, (b) all required behavior support services, and (c) a dedicated aide for 7 hours every day. *See* AR 26–29. HO Vaden found that DCPS missing 18 hours of OT services was a material failure to implement D.H.'s IEP and awarded D.H. 18 hours of compensatory education. *See* AR 28. But HO Vaden found that DCPS's withholding 120 out of over 1,000 minutes of behavior support services was not a material failure and thus did not constitute a denial of a FAPE. *See* AR 28. Lastly, HO Vaden found for DCPS regarding the dedicated aide requirements. *See* AR 29.

On July 2, 2024, Plaintiffs filed a complaint seeking a partial reversal of the HOD. *See* Compl. for Declaratory J. & Injunctive and Other Relief ("Pls.' Compl.") 2, ECF No. 1. The complaint alleges that DCPS denied D.H. a FAPE when it (1) failed to evaluate him in all areas of

6

suspected disability, (2) failed to provide an appropriate IEP from January 1, 2022, until the filing of the complaint, and (3) failed to comply with the IEP's dedicated aide requirements. *See id.* at 17–19. On January 17, 2025, Plaintiffs filed their Motion for Summary Judgment. *See* Pls.' Mot. On April 4, 2025, DCPS filed its Opposition and Cross-Motion for Summary Judgment. *See* Def.'s Cross-mot. On January 31, 2025, Judge Cooper referred the case to the undersigned for full case management. *See* Min. Order (Jan. 31, 2025).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court must grant summary judgment when "there is no genuine issue as to any material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting Fed. R. Civ. P. 56(c)). The Court must view the facts "in the light most favorable to the party opposing the motion." *Williams v. Wash. Metro. Area Transit Auth.*, 721 F.2d 1412, 1414–15 (D.D.C. 1983) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

Summary judgment under the IDEA "is not a true summary judgment procedure." *L.R.L. ex rel. Lomax v. D.C.*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)). "Instead, the district court essentially conduct[s] a bench trial based on a stipulated record." *Id.* (quoting *Ojai Unified Sch. Dist.*, 4 F.3d at 1472). Therefore, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *N.W. v. District of Columbia*, 253 F. Supp. 3d 5, 12 (D.D.C. 2017) (quoting *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009)).

The burden is on the plaintiff to prove by a preponderance of the evidence that the hearing officer's determination was wrong. *See* 20 U.S.C. § 1415(i)(2)(C)(iii); *Pavelko v. District of*

*Columbia*, 288 F. Supp. 3d 301, 306 (D.D.C. 2018) (quoting *Reid ex rel. Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005)). "While the court must make an independent determination, the court also should give 'due weight' to the decision of the hearing officer and should afford some deference to the expertise of the hearing officer and the school officials." *Middleton v. District of Columbia*, 312 F. Supp. 3d 113, 129 (D.D.C. 2018) (quoting *D.K. v. District of Columbia*, 983 F. Supp. 2d 138, 144 (D.D.C. 2013)). In accordance with this deference, "[f]actual findings from the administrative proceeding are to be considered prima facie correct," *D.R. ex rel. Robinson*, 637 F. Supp. 2d at 16 (quoting *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)), "unless [the court] can point to contrary nontestimonial extrinsic evidence on the record," *A.A. v. District of Columbia*, No. 16-cv-248, 2017 WL 11589194, at *6 (D.D.C. Apr. 20, 2017) (quoting *Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012)). Courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. Still, courts are to offer "'less deference than is conventional' in administrative proceedings." *Reid*, 401 F.3d at 521 (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989)). Pure questions of law, however, are reviewed de novo. *See id.*

### III. ANALYSIS

#### A. Failure to Reevaluate D.H. in July 2023, Including a Comprehensive Psychological Assessment and FBA

There are two instances where a student must be reevaluated more than once every three years: "(1) If the public agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or (2) If the child's parent or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2). Plaintiffs argue that both prongs of § 1414(a)(2) required DCPS to reevaluate D.H. *See* Pls.' Mot. at 14–15.

There is no specific set of tests that must be used in a reevaluation. *See* 20 U.S.C. § 1414(b)(2)(A). The reevaluation process begins with a review of existing data, including prior testing, classroom observations, and parental input. *See id.* §1414(c). Based on this review, the IEP team should identify any additional tests needed to determine the child's educational needs. *Id.* § 1414(c)(1)(B). At that point, the parent may request that DCPS conduct a particular assessment if they are dissatisfied with the assessments proposed by the IEP team. *Id.* § 1414(c)(4). Even then, "[t]he IDEA does not require [local education agencies] to administer every test requested by a parent." *Long v. District of Columbia*, 780 F. Supp. 2d 49, 60 (D.D.C. 2011).

### 1.   *Exhaustion of Administrative Remedies*

DCPS argues that Plaintiffs did not explicitly raise the claim that DCPS failed to timely reevaluate upon parental request, and thus, failed to exhaust it. *See* Def.'s Cross-mot. at 15. A plaintiff's "failure to exhaust administrative remedies . . . deprives the court of its authority to hear an IDEA claim." *B.R. ex rel. Rempson v. District of Columbia*, 802 F. Supp. 2d 153, 162 (D.D.C. 2011) (citing 20 U.S.C. § 1415(c), (e)). DCPS claims that Plaintiffs instead focused on DCPS's alleged failure to comprehensively evaluate D.H. in all areas of suspected disability. *See* Def.'s Cross-mot. at 15. However, Ms. Harris's DPC alleged DCPS's failure to respond to her reevaluation request: "[e]ven though parent is not required to request evaluations to address student's on-going behaviors, it should be noted that Parent did make this request several times." AR 48. The DPC also described how Ms. Harris "reiterated her request for comprehensive evaluations on or about 7/13/2023." AR 46.

In both cases cited by DCPS, the plaintiff added entirely new claims not addressed in the underlying DPC. *See B.R. ex rel. Rempson*, 802 F. Supp. at 162; *S.S. ex rel. Street v. District of Columbia*, 68 F. Supp. 3d 1, 20 (D.D.C. 2014). In *B.R. ex rel. Rempson*, the plaintiffs failed to

exhaust a claim for compensatory education for extended school year services when the underlying DPC did not allege a failure to provide these services. 802 F. Supp. 2d at 162. And in *S.S. ex rel. Street*, the plaintiff could not add a retaliation claim where she did not allege any facts concerning retaliation in her DPC. 68 F. Supp. 3d at 20–21. Here, Ms. Harris raised the issue of DCPS failing to respond to her request in her DPC. *See* AR 46, 48. As such, she exhausted her administrative remedies. *See B.R. ex rel. Rempson*, 802 F. Supp. 2d at 162.

### 2. *Parental Request*

The IDEA requires reevaluation by the public agency upon parental request if it has been at least one year since the student's last reevaluation. *See* 20 U.S.C. § 1414(a)(2)(A)(ii). Reevaluations must meet the same standard as initial evaluations. *See id.* § 1414(a)(2).

DCPS argues that it did not receive proper notice of Ms. Harris's request for reevaluation because she made the request to D.H.'s private school, and not DCPS directly. *See* Def.'s Cross-mot. at 15–16. Parents should make reevaluation requests directly to DCPS; however, courts have found proper notice even when they make it indirectly. For example, in *Herbin v. District of Columbia*, the plaintiff sent a letter to the principal of the student's public charter school. 362 F. Supp. 2d 254, 256 (D.D.C. 2005). "Because DCPS was on notice that plaintiffs wanted a reevaluation of [the child's] placement, DCPS was obligated [] to review and possibly revise her IEP." *Id.* at 264 (quoting *Edwards-White v. District of Columbia*, 785 F. Supp. 1022, 1024 (D.D.C. 1992)). The remedy for DCPS's failure was an order for reevaluation. *See id.* at 265.

In July 2023, Ms. Harris's counsel sent a reevaluation request by email to the head of the private school D.H. was attending and copied the DCPS monitoring assistant, Ms. Mayo. *See* AR 16. In August 2023, Ms. Mayo responded directly to that email request. *See* AR 1003. Her response

10

demonstrated that she was on notice, which triggered a duty for DCPS to reevaluate D.H. *See* 20 U.S.C. § 1414(a)(2)(A)(ii).

"Reevaluations should be conducted in a 'reasonable period of time,' or 'without undue delay,' as determined in each individual case." *Herbin,* 362 F. Supp. 2d at 259 (citation omitted). On August 25, 2023, Ms. Mayo responded with proposed dates for D.H.'s IEP review and data analysis meeting. *See* AR 1003. The purpose of such meeting was to agree on necessary reevaluations. *See* AR 1003. Ms. Mayo's response recognized that there would be new evaluations. *See* AR 1003. On December 4, 2023, DCPS initiated D.H.'s triennial reevaluation process. *See* AR 17. This five-month delay was not undue. *See Herbin*, 362 F. Supp. 2d at 265 (finding a four-month delay in responding to a reevaluation request not unreasonable). On January 29, 2024, the DCPS team finalized an updated FBA and BIP. *See* AR 17, 551.

Ms. Harris's July 2023 request did not obligate DCPS to conduct a comprehensive psychological evaluation in December 2023 or another FBA after the January 2024 FBA. Instead, DCPS "has the authority to choose assessment tools and strategies to gather relevant information." *Day v. KIPP DC Pub. Charter Schs.*, No. 19-cv-1223, 2021 WL 3507602, at *4 (D.D.C. Jan. 20, 2021) (citing *Long*, 780 F. Supp. 2d at 60). Because DCPS timely started the reevaluation process after receiving notice of Ms. Harris's request, there was no denial of FAPE. *See Herbin*, 362 F. Supp. 2d at 262.

### 3. Declining Behavior

The IDEA requires an FBA when there is a disciplinary change in placement. *See* 20 U.S.C. § 1415(k)(1)(D)(ii). DCPS satisfied this obligation. On January 29, 2024, it finalized an updated FBA and BIP after D.H. transferred to the Foundation School. *See* AR 17, 551.

A student must be reevaluated more than once every three years "[i]f the local educational agency determines that the educational or related services needs . . . of the child warrant a reevaluation." 20 U.S.C. § 1414(a)(2)(A)(i). Ms. Harris argues that DCPS should have found that D.H.'s declining behavior warranted a reevaluation, especially an updated FBA. *See* Pls.' Mot. at 15. To support this claim, Ms. Harris testified that "at Phillips, certain things [] would really, really bother him," and that "he ha[d] left the building . . . jumped the gate, walked out of school." AR 1514. Dr. Crawford testified about her concern for D.H.'s "issues with verbal and physical aggression." AR 1427.

Mr. Ryan, the DCPS monitoring specialist, testified about D.H.'s behaviors based on "observations, input from staff, [and] work samples." AR 1622. HO Vaden credited this testimony and concluded that D.H.'s behavior and academic performance had not warranted a reevaluation. *See* AR 19–22. "[An HO's] findings 'based on credibility determinations of live witness testimony' are given 'particular deference.'" *McAllister v. District of Columbia*, 45 F. Supp. 3d 72, 76 (D.D.C. 2014) (quoting *R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89–90 (D.D.C. 2005)). Supporting this conclusion, as of June 23, 2023, D.H. had mastered three IEP reading goals and was progressing on two IEP math goals and five social-emotional goals. *See* AR 15. And according to Ms. Harris, D.H. was "doing well" and "on-level behavior-wise" after his transfer. AR 17.

Regardless, the IDEA does not require the IEP team to conduct an FBA to meet its initial evaluation obligations. *See* 20 U.S.C. § 1414(d)(3)(B)(i). Because reevaluations follow the same standards as initial evaluations, an FBA is also not a required component of a reevaluation. *See* 20 U.S.C. § 1414(a)(2)(A). An FBA is not necessary if a student's IEP otherwise adequately addresses behavioral issues. *See Cundiff-Enoch v. District of Columbia*, No. 22-cv-3713, 2024 WL 396451,

at *11 (D.D.C. 2024). Indeed, "[t]he IDEA does not require the IEP team to include positive behavioral interventions or supports in the IEP, much less an FBA specifically." *Id.* at *10. As noted above, the IEP adequately addressed D.H.'s behavioral issues. *See supra*.

Even if D.H.'s behavior had warranted an updated FBA, DCPS finalized one within a month of Ms. Harris filing her DPC. *See* AR 22. Ms. Harris's "demands have been rendered moot in light of the fact that an evaluation was finally completed and supplied . . . soon after the initiation of the instant lawsuit." *Stellato ex rel. Rebecca v. Bd. of Educ. of Ellenville Cent. Sch. Dist.*, 842 F. Supp. 1512, 1516 (N.D.N.Y. 1994). Similarly, in *Stellato*, the parents' demand for a reevaluation was mooted when the agency reevaluated the child one month after the filing of the complaint. *See id.* at 1514–16. "Thus, the argument goes, since the evaluation was eventually done on [D.H.], there is no longer a 'live' controversy for this court to address." *Id.* at 1516; *see also J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020) (holding that a "declaratory judgment" on DCPS's obligation to complete an FBA "would provide no effectual relief").

B.   Appropriateness of the IEPs for the 2021-22, 2022-23, and 2023-24 School Years

An IEP must contain "[a] statement of the child's present levels of academic achievement and functional performance, including . . . [h]ow the child's disability affects the child's involvement and progress in the general education curriculum." AR 25 (citing 34 C.F.R. § 300.320(a)). The IDEA "cannot and does not promise 'any particular [educational] outcome." *Endrew F. ex rel. Joseph F.*, 580 U.S. at 398 (quoting *Rowley*, 458 U.S. at 192). "[T]he question is whether the IEP is *reasonable*, not whether it is ideal." *Id.* at 399. As such, "limited academic progress does not *ipso facto* signal a violation of the IDEA any more so than does the existence of substantially similar IEPs year over year." *Edward M.-R. ex rel. T.R.-M. v. District of Columbia*,

13

660 F. Supp. 3d 82, 113 (D.D.C. 2023) (quoting *J.B. ex rel. Belt v. District of Columbia*, 325 F. Supp. 3d 1, 9 (D.D.C. 2018)).

Plaintiffs argue that the IEPs were based on classroom observation rather than updated test results. *See* Pls.' Mot. at 17–20. Plaintiffs' witness, Dr. Crawford, expressed concern at the lack of academic evaluations in D.H.'s IEPs. *See id.* at 17. But test results are not the only metric for progress. In *Edward M.-R. ex rel. T.R.-M.*, the HO "credited the IEP progress reports that stated that, notwithstanding the mixed picture in his test scores, [the student] had made some progress in his goals." 660 F. Supp. 3d at 116. Indeed, the Court was "unpersuaded by Plaintiffs' attack on [the student's IEPs] based on his failure to make greater progress over the years and the repetition of certain goals in those IEPs." *Id.*

Similarly, D.H. made progress on several IEP goals, and each IEP contained updated goals to reflect this progress. *See* AR 419–533. For example, D.H.'s accuracy in solving word problems in math increased from 65% to 78% between 2021 and 2022, nearly meeting his goal of 80% accuracy. *See* AR 423, 446. In 2023, D.H. was able to solve multi-step word problems, so his IEP goals progressed to algebraic expressions. *See* AR 445. D.H. met his 2022 goal of writing an opinion paragraph with 75% accuracy. *See* AR 425, 450. His 2023 IEP then focused on writing three-paragraph essays. *See* AR 501. It is true that D.H.'s behavioral issues continued throughout the three years and his instances of physical aggression increased from 2022 to 2023. *See* AR 429, 452. However, he used coping skills when he felt agitated in 67% of incidents in 2023, an improvement from 50% in 2021. *See* AR 429, 505. These successes reflect sufficient progress to justify the IEP. Indeed, courts have accepted fewer successes as adequate progress. For example, in *J.B. ex rel. Belt*, the HO found an IEP sufficient where the student made no progress on multiple competencies. 325 F. Supp. 3d at 4.

Regardless, it is not the case that "any time a child makes limited, or even zero, progress, that a school system has necessarily failed to provide FAPE and violated the IDEA." *Id.* at 9. "The proper measure [of an IEP's sufficiency] is the reasonableness of [the] IEP's design." *Edward M.R. v. District of Columbia*, 128 F.4th 290, 294 (D.C. Cir. 2025). "[E]ven if we consider [D.H.'s] lack of progress as some evidence that his IEPs were not reasonably designed from the get-go, that evidence is not enough. [Plaintiffs] must identify a flaw in the design of an IEP, and [they have] not done so." *Id.*

Ultimately, the IEP team had the data they needed to appropriately program for D.H. Mr. Ryan testified that they drew data from many sources, including from "informal [] observations, input from staff, [and] work samples." AR 1622. Mr. Ryan's observations came from spending eight months with D.H. *See* AR 1623. HO Vaden found Mr. Ryan's testimony persuasive. *See* AR 25. And HO Vaden did not just rely on Mr. Ryan's testimony. He reviewed each IEP at issue—September 21, 2021, October 13, 2022, and October 5, 2023—and identified examples in which the IEPs included updated statements of D.H.'s achievement and performance in math, reading, written expression, and behavioral skills. *See* AR at 25–26. Thus, the HO considered Mr. Ryan's testimony together with the information in the IEPs when crediting Mr. Ryan's opinion that the IEP teams had "the data needed to program for the student." AR 25, 1622. The Court will defer to a HO who has considered "testimony from educators who had personal knowledge of the student and . . . IEP progress reports." *Moradnejad v. District of Columbia*, 177 F. Supp. 3d 260, 278 (D.D.C. 2016). "Moreover, even if [Dr. Crawford] had more experience with [D.H. than Mr. Ryan] on paper, the [HO] is still entitled to deference in the absence of 'extrinsic evidence' contradicting the [HO's] credibility determinations." *W.S. v. District of Columbia*, 502 F. Supp. 3d 102, 124 (D.D.C. 2020).

The contested IEPs were based on a variety of data sources and reflected some progress each year. *See* AR 25, 423, 450, 501. Thus, the court should defer to HO Vaden's conclusion that the IEPs were appropriate. *See* AR 26.

### C. Failure to Provide Dedicated Aide Services

"A material failure to implement a student's IEP constitutes a denial of FAPE." *Middleton*, 312 F. Supp. 3d at 144 (citing *Johnson v. District of Columbia*, 962 F. Supp. 2d 263, 268–69 (D.D.C. 2013)). Parties challenging a district's implementation of an IEP must "demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP," or that "deviations from the IEP's stated requirements [were] 'material.'" *Id.* at 128 (quoting *Catalan ex rel. E.C. v. District of Columbia*, 478 F. Supp. 2d 73, 75 (D.D.C. 2007)). "[C]ourts applying [this] standard have focused on the proportion of services mandated to those actually provided, and the goal and import (as articulated in the IEP) of the specific service that was withheld." *Wilson v. District of Columbia*, 770 F. Supp. 2d 270, 275 (D.D.C. 2011).

In assessing claims of missed services, the HO, as "the trier of fact at the due process hearing" has the "responsibility to determine how much weight to give the evidence." *A.I. ex rel. Iapalucci v. District of Columbia*, 402 F. Supp. 2d. 152, 170 (D.D.C. 2005). "There are strong policy considerations for providing the [HO] such leeway; as the [HO]—as opposed to this court—has the opportunity to hear testimony in person, examine the demeanor of the witness and reactions of the participants, and can bring immeasurable experience and expertise in this specialized area." *Id.*

In her DPC, Ms. Harris alleged "upon information and belief" that there were days when D.H. did not have a dedicated aide or the aide was helping several students at a time. *See* AR 29. Ms. Harris described the dedicated aide services as "up and down" and stated that the aide did not

16

pay attention to D.H. *See* AR 29. However, HO Vaden found that "there was scant evidence to support this claim." *See* AR 29. Besides Ms. Harris's testimony, "there was no other evidence offered at the hearing as to if, or when, [Phillips Laurel School] 'withheld' dedicated aide services." *See* AR 29. It is within the HO's discretion to reject such unsubstantiated claims. For example, in *Catalan ex rel. E.C.*, the plaintiffs claimed that a therapist "missed a handful of sessions and cut others short." 478 F. Supp. 2d at 76. But without any additional evidence, the HO—and the court—found that plaintiffs did not sufficiently demonstrate material failures. *See id.* The same rings true here.

According to Plaintiffs, HO Vaden did not reject Ms. Harris's testimony but rather misunderstood it. *See* Pls.' Mem. Opp'n Def.'s Cross-mot. ("Pls.' Reply") 10–12, ECF No. 15. However, by not making findings of fact based on her testimony, and referring to her testimony as insufficient, HO Vaden did not credit Ms. Harris's testimony. *See* AR 29. The HO was within his right to do so. *See Garris v. District of Columbia*, 210 F. Supp. 3d 187, 190 (D.D.C. 2016). "That Plaintiffs dr[e]w a different conclusion from that evidence does not make [HO Vaden's] conclusion improper." *Id*.

Plaintiffs also argued that Ms. Harris's inability to "specify precisely how often D.H. was without his aide" was "virtually unavoidable." Pls.' Mot. at 22. However, Plaintiffs could have compelled Phillips Laurel School witnesses to testify about the aide services and chose not to. *See* 20 U.S.C. § 1415(h)(2). Moreover, "simply because [Ms. Harris's testimony was] unrebutted and unchallenged, does not mean the finder of fact . . . [was] bound to accept it as true." *McAllister*, 45 F. Supp. 3d at 77 (D.D.C. 2014). Nor did the HO need to offer a "detailed explanation for why he gave more weight to Defendants' evidence than to Plaintiffs' evidence." *A.I. ex rel. Iapalucci*, 402 F. Supp. 2d at 170. The Court defers to HO Vaden's decision not to credit Ms. Harris's

17

testimony. *See id.* Ultimately, Plaintiffs "failed to carry [their] burden in challenging the [HO's] conclusions . . . [by] rel[ying] solely on [Ms. Harris's] testimony." *Joaquin v. Friendship Pub. Charter Sch.*, No. 14-cv-1119, 2015 WL 5175885, at *8 (D.D.C. 2015). Because there was no other evidence regarding the proportion of dedicated aide services missed, Plaintiffs did not establish a denial of FAPE.

## IV.　RECOMMENDATION

The Court recommends DENYING Plaintiffs' Motion for Summary Judgment and GRANTING Defendant's Cross-motion for Summary Judgment.[2]

Date: July 31, 2025

_____
ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE

---

[2] The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the U.S. District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within fourteen days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).